2022 IL App (1st) 211368-U

SECOND DIVISION
August 30, 2022

No. 1-21-1368

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| JONATHAN C. GAMZE, M.D., | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 17 L 7185 |
| | ) | |
| JOHN SEIBEL and CASSIDAY SCHADE, LLP, | ) | |
| | ) | Honorable Edward S. Harmening, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*: We affirm the order of the circuit court in this legal malpractice case granting defendants' motion for summary judgment; plaintiff failed to submit non-speculative evidence that a more favorable settlement in the underlying disciplinary proceedings would have been accepted by the Department; therefore, plaintiff failed to supply evidence of proximate cause.

¶ 2    The Illinois Department of Financial and Professional Regulation (IDFPR) filed a

disciplinary complaint against Plaintiff Jonathan Gamze, M.D. Dr. Gamze retained defendants

John Seibel and Cassiday Schade, LLP to defend him against the disciplinary action. Following

negotiations, Dr. Gamze accepted a settlement from the IDFPR that resulted in restrictions on his medical privileges.

¶ 3     After accepting the settlement and later regaining full medical privileges, Dr. Gamze filed this case against Seibel and Cassiday Schade. Dr. Gamze alleges in his complaint that his attorneys were negligent for failing to secure better settlement terms for him. Dr. Gamze claims that, had his attorneys complied with the standard of care when representing him, he would have received less stringent restrictions on his medical privileges and would have regained full medical privileges much sooner. Seibel and Cassiday Schade moved for summary judgment arguing that Dr. Gamze failed to submit evidence to create a genuine issue of material fact on the element of proximate cause because there is no evidence the IDFPR would have accepted a settlement with less stringent restrictions on plaintiff. Seibel and Cassiday Schade also argued that the expert opinion offered by Dr. Gamze should be stricken or otherwise disregarded because it is speculative and contains conclusions unsupported by facts. The trial court agreed with Seibel and Cassiday Schade that Dr. Gamze failed to submit evidence on the issue of proximate cause, finding that "the element of proximate cause is missing" and that there is a "fatal gap" in Dr. Gamze's case. Dr. Gamze appeals from the trial court's grant of summary judgment. For the following reasons, we affirm.

¶ 4                                          BACKGROUND

¶ 5     Plaintiff Dr. Jonathan Gamze is a psychiatrist. In connection with his duties as a psychiatrist, plaintiff maintains both a medical license and a controlled substance license as he sometimes prescribes for his patients medications that are regulated by laws governing the distribution of controlled substances.

¶ 6                                   The Underlying Proceedings

¶ 7      A pharmacist, Susan Johnson, became concerned when one of her customers, who was one of plaintiff's patients, frequently presented prescriptions for high doses of Adderall which were being refilled early. Adderall is regulated as a Schedule II controlled substance because of its potential for abuse. Johnson searched the Illinois Prescription Monitoring Program database in which an entry is made each time a prescription is filled in Illinois for one of the controlled drugs. When Johnson reviewed the prescriptions being filled for this particular patient, she believed that plaintiff was overprescribing controlled substances to the patient. The amount and frequency with which this patient was refilling Adderall prescriptions, along with the fact that the prescriptions were being filled at multiple pharmacies, led Johnson to believe that the patient was abusing drugs or engaged in drug-seeking behavior. Johnson made a complaint with the IDFPR about plaintiff's prescribing practices.

¶ 8      After receiving the complaint from Johnson, the IDFPR began an investigation into plaintiff's practice of prescribing controlled substances. The IDFPR received medical and prescription records from plaintiff's office. The IDFPR wanted to look at all the records of plaintiff's prescribing practices to make sure it was a widespread issue and not just an isolated incident—they wanted to make sure plaintiff was engaged in a pattern and practice of overprescribing controlled substances and that a prosecution was worth their time and effort.

¶ 9      An investigator from the IDFPR spoke to plaintiff. The investigator documented in his report that plaintiff told the investigator during the interview that he did not know the law about prescribing Schedule II controlled substances. Plaintiff also told the investigator that it appeared he had messed up and was willing to accept the punishment.

¶ 10 A few weeks after plaintiff met with the investigator from the IDFPR, he retained defendants John Seibel and Cassiday Schade, LLP to represent him in the coming disciplinary proceedings. Seibel was assisted on plaintiff's matter by Kathleen Barrett, an associate attorney at the firm who previously worked at the IDFPR as a clerk under Illinois Supreme Court Rule 711. Barrett had worked with Seibel on the firm's IDFPR cases in the past because of the experience she gained from working at the IDFPR.

¶ 11 Seven months after plaintiff retained defendants to represent him, the IDFPR filed a complaint against plaintiff for overprescribing controlled substances. The complaint focused on one particular patient, A.S., to whom plaintiff prescribed Adderall, the patient whose prescriptions caught the attention of Pharmacist Johnson. The complaint detailed the evidence gathered during the IDFPR's investigation of plaintiff. Plaintiff prescribed multiple controlled substances to A.S., including Adderall, Suboxone, and Valium. The IDFPR concluded that plaintiff "authorized multiple prescriptions for controlled substances without properly evaluating and/or monitoring patient A.S. for signs, symptoms and/or warning signs of drug abuse" and "ignored multiple red flags and/or signs of drug abuse exhibited by patient A.S." over a three-year period. The IDFPR alleged in the complaint that plaintiff violated the Medical Practices Act through his prescribing practices and claimed that plaintiff was likely to cause harm to patients in the future. The IDFPR sought revocation or suspension of both plaintiff's medical and controlled substance licenses.

¶ 12 After the disciplinary complaint was filed, the prosecutor assigned to the case, Vladimir Lozovskiy, offered plaintiff a settlement of the disciplinary case. The initial offer from Lozovskiy was an indefinite probation for a minimum of three years for plaintiff's medical license and an indefinite suspension for a minimum of one year for plaintiff's controlled

substance license. Defendants and Lozovskiy continued to negotiate from the initial offer. After negotiation, the IDFPR agreed to a negotiated settlement containing the same terms of probation for plaintiff's medical license, but instead of an indefinite suspension with a minimum one-year suspension of his controlled substance license, plaintiff would receive an indefinite suspension of his controlled substance license with no minimum. The indefinite suspension, as opposed to the one-year suspension, would allow plaintiff to complete certain educational requirements and then apply for his suspension to be lifted immediately. Under the initial offer, plaintiff would have had to wait a year before he could apply for the lifting of the suspension. After the negotiated settlement was presented to plaintiff by his attorneys, he agreed to accept it.

¶ 13    Seven weeks after the suspension of plaintiff's controlled substance license went into effect, plaintiff completed the educational requirements set forth in his settlement. Less than two months after the settlement went into effect, plaintiff, with the counsel of defendants, petitioned for the restoration of his controlled substance license. Defendants withdrew from representing plaintiff a few months after filing the petition for the restoration of his controlled substance license. Plaintiff's license was subsequently restored, but not until it had already been suspended for 23 months. Plaintiff's Illinois controlled substance license was restored in September 2017. His DEA license was restored in October 2017.

¶ 14                          The Legal Malpractice Case

¶ 15    Plaintiff subsequently filed a legal malpractice case against defendants, his former attorneys. Plaintiff alleges defendants breached the standard of care and, as a result, he was forced to accept an unfavorable settlement. Plaintiff alleges that, if defendants complied with the standard of care, he would not have had his controlled substance license suspended or it would have been suspended for a far shorter period. Plaintiff claims he suffered an excess of $3 million

in damages due to the suspension of his controlled substance license because of defendants' negligent performance of services.

¶ 16    The parties conducted discovery including the depositions of the parties and their expert witnesses. In support of his claim for legal malpractice, plaintiff offered the expert opinion of Edward Williams, an attorney who regularly represents licensed professionals before the IDFPR, including many doctors. Williams previously served for three years as a prosecutor at the IDFPR and presided over the prosecutions of hundreds of licensed professionals. Williams opined that, had defendants complied with the applicable standard of care in their representation of plaintiff, plaintiff would have received a definite suspension of his controlled substance license for no more than 60 days. Williams' opinion was based on his review of the file in this case, his experience working on the thousands of cases he has handled, and on a purportedly comparable case from the same time period in which a doctor he represented received a 60-day definite suspension of his controlled substance license.

¶ 17    Williams concluded that defendants failed to take the necessary steps to put the case in a proper position from which they could negotiate a reasonable settlement for plaintiff. Williams believed, based on his review of the relevant materials, that plaintiff had a reasonable defense to the IDFPR complaint, that plaintiff would make a good witness, and that there were other mitigating circumstances that could lead to some room for negotiation of plaintiff's punishment. Williams stated that in the past when the IDFPR prosecutors have made offers to his clients that are unfavorable, he has prepared for a trial and then been able to secure better offers. Williams explained that an attorney handling an IDFPR case should know that a definite suspension period is often more favorable because it does away with the requirement that the professional has to petition for reinstatement of his license which is often subject to significant delays.

¶ 18    Williams' opinion is that defendants were negligent in representing plaintiff because they were: (1) completely ignorant of the way to defend an IDFPR overprescribing case; (2) failed to see whether discipline could be mitigated; (3) allowed an associate who had never defended an IDFPR case to be primarily responsible for the defense; (4) failed to understand the difference between definite and indefinite suspensions (and did not understand that definite suspensions even existed); (5) failed to consult with an expert after discovery was complete; (6) failed to conduct their own investigation into the matter; and (7) failed to investigate plaintiff's defenses.

¶ 19    Williams also described a case he handled for an orthopedic surgeon before the IDFPR during the same time period as plaintiff's case. The surgeon in that case was accused of overprescribing a drug to a patient and received a definite suspension of 60 days of his controlled substance license. Williams detailed in his expert disclosure the steps he took in defense of the surgeon and offered his opinion that defendants could have obtained the same discipline for plaintiff that the surgeon he represented obtained.

¶ 20    When deposing plaintiff's expert, Williams, defendants questioned him about the lack of evidence that the IDFPR would have been willing to accept more favorable terms than those to which plaintiff agreed. When asked whether there was evidence that the IDFPR would have agreed to settlement terms other than what had been offered or agreed to, Williams testified:

"Q. Do you have any evidence from any source that Vlad [Lozovskiy] would have agreed to any terms different than what were offered in the consent order we just looked at in Exhibit 9 and was ultimately signed?

A. Physical evidence? No.

Q. Do you have any facts that Vlad would have agreed to any different terms other than is reflected in the consent order that was ultimately executed by the Director?

A. Facts in this case?

Q. Yes.

A. No.

Q. Do you have any facts that the Director of the Department would have agreed to any different terms other than included in the consent order that was ultimately approved in this case?

A. Any same - - question but for the Director?

Q. Yes.

A. There are no - - there's no physical evidence in this case that would be contrary to that. Correct."

¶ 21   Vladimir Lozovskiy was the senior IDFPR attorney assigned to prosecute the case against plaintiff. Lozovskiy testified that the offers he makes to settle prosecutions at the IDFPR are generally "take it or leave it" offers that can be revoked at any time. Lozovskiy further testified that, if a respondent in a disciplinary hearing does not take an offered settlement, he has the discretion to amend the complaint to include additional violations of the Medical Practice Act before taking the case to trial. In this case, the IDFPR investigation focused on 11 additional patients to whom plaintiff allegedly overprescribed controlled substances.

¶ 22    Defendants moved for summary judgment on plaintiff's claim for legal malpractice. Defendants argued in their motion that summary judgment was warranted because plaintiff could not prove the essential element of proximate causation. Defendants contended that plaintiff could

produce no non-speculative evidence that the IDFPR would have agreed to offer a more advantageous settlement or that plaintiff otherwise would have received a better outcome than the discipline he received under the settlement.

¶ 23    In support of the motion for summary judgment, defendants relied on a variety of evidence, including the deposition of Vladimir Lozovskiy, the IDFPR prosecutor in charge of prosecuting plaintiff.

¶ 24    Plaintiff responded to the motion for summary judgment and argued that he had submitted evidence to create a genuine issue of material fact on the question of proximate cause. Plaintiff relied predominately on the expert opinion and testimony of Williams to argue that it was more likely than not that plaintiff would have received a better outcome but for defendants' negligent representation. Plaintiff contended that an attorney acting in accordance with the standard of care would have obtained for plaintiff a definite suspension of no more than 60 days and that it was defendant's negligence that caused plaintiff to receive a worse outcome.

¶ 25    The trial court held a hearing on the motion for summary judgment in which it heard argument from the parties. At the conclusion of the hearing, the trial court stated that it was going to grant the motion for summary judgment. The trial court explained, "I do think that the element of proximate cause is missing and that there is a fatal gap, based upon the record I've heard. So the motion for summary judgment is granted." The trial court subsequently entered a written order to confirm its ruling on the summary judgment motion. Plaintiff then filed this appeal.

¶ 26                              ANALYSIS

¶ 27    Plaintiff argues that the trial court erred when it granted defendants' motion for summary judgment. Summary judgment is appropriate when the pleadings, depositions, admissions, and

affidavits, viewed in a light most favorable to the nonmovant, fail to establish a genuine issue of material fact, thereby entitling the moving party to judgment as a matter of law. 735 ILCS 5/2– 1005 (West 2018); *Fox v. Seiden*, 2016 IL App (1st) 141984, ¶ 12. Summary judgment is encouraged as an expeditious manner of disposing of a lawsuit, but it should only be utilized when a party's right to a judgment is clear and free from doubt. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). We review a trial court's ruling on a motion for summary judgment *de novo. Illinois Tool Works Inc. v. Travelers Casualty & Surety Co.,* 2015 IL App (1st) 132350, ¶ 8.

¶ 28    There is no issue here whether plaintiff violated the Illinois Medical Practice Act (225 ILCS 60/1 *et seq*. (West 2020)) and the Controlled Substances Act (720 ILCS 570/100 *et seq*. (West 2020)). Plaintiff and several witnesses, including his own retained expert, confirm that plaintiff prescribed controlled substances in violation of the controlling statutes. The only issue for our examination sitting in *de novo* review is whether there is any evidence that plaintiff would have received a more favorable outcome with the IDFPR if defendants had taken actions plaintiff argues are required to comply with the applicable standard of care. Specifically, did plaintiff produce some evidence that, but for defendants' conduct, (1) the IDFPR would have offered plaintiff a settlement with a suspension of his controlled substance license for a fixed period of time that would not have required him to petition for restoration; or (2) would plaintiff have received more favorable discipline after a full trial on the merits before the IDFPR if he rejected the settlement? Based on the record submitted, there is no evidence, and only inadmissible speculation, that plaintiff could have received lesser discipline of his controlled substance license from the IDFPR if defendants had taken alternative action in his defense.

¶ 29    Plaintiff submits that he has demonstrated through expert testimony that defendants' representation of him failed to meet the prevailing standard of care and proximately caused his damages. Plaintiff relies almost exclusively on the expert opinion of Edward Williams to support his claim that he has submitted evidence to create a triable issue of fact on the question of proximate cause. Plaintiff argues that Williams' expert opinion constitutes evidence showing that defendants' deviations from the standard of care caused the differential between the actual outcome and the outcome that would have been obtained by a non-negligent attorney.

¶ 30    The elements of a cause of action for legal malpractice are: (1) the defendant-attorney owed the plaintiff-client a duty of care arising from an attorney-client relationship; (2) the attorney breached that duty; (3) the client suffered an injury in the form of actual damages; and (4) the actual damages resulted as a proximate cause of the breach. *Huang v. Brenson*, 2014 IL App (1st) 123231, ¶ 25. To prevail in a legal malpractice action alleging negligent handling of a settlement, the plaintiff must show that the settlement terms were less favorable than he could reasonably expect without malpractice. *Brooks v. Brennan*, 255 Ill. App. 3d 260, 270 (1994). Proximate cause in a legal malpractice case requires plaintiff to prove that "but for" the attorney's negligence, the plaintiff would have been successful in the undertaking the attorney was retained to perform. *King Koil Licensing Co. v. Harris*, 2017 IL App (1st) 161019, ¶ 66 (citing *Green v. Papa*, 2014 IL App (5th) 130029, ¶ 33). Expert testimony may be used to demonstrate what the result should have been in the underlying proceeding. *Nika v. Danz*, 199 Ill. App. 3d 296, 315 (1990) (citing 2 R. Mallen & J. Smith, Legal Malpractice § 27.16, at 679 (3d ed. 1989)).

¶ 31    Williams opined in his affidavit that the offer defendants negotiated, and that plaintiff accepted, was not a superior offer to the initial offer made by Lozovskiy. The initial offer had an

indefinite suspension of plaintiff's controlled substance license for a minimum of one year. The negotiated settlement had only an indefinite suspension with no mandatory minimum. Because of the settlement, plaintiff was allowed to complete continuing education courses and petition for restoration of his controlled substance license seven weeks after the suspension went into effect. Had the one-year minimum term remained in the agreement, plaintiff would not have been able to petition for the restoration of his controlled substance license for another 10 months. While certain delays hampered the benefit afforded by the negotiated settlement, the negotiated settlement was undoubtedly superior to the initial offer made by the IDFPR. It is reasonable to assume plaintiff would have faced similar delays when he applied for restoration after one year, so the fact he was able to start the process 10 months earlier was a tangible benefit. When asked whether the terms of the negotiated settlement were more favorable than his initial offer, Lozovskiy confirmed that the negotiated settlement was more favorable "because it doesn't have a minimum period attached to the indefinite period of suspension."

¶ 32    Plaintiff also received a significant benefit by entering into a settlement based on the allegations of impropriety related to only one patient. Plaintiff was under investigation for overprescribing controlled substances to 11 other patients identified by the IDFPR, and the complaint could have been amended to add those charges had the settlement not been accepted.

¶ 33    The major thrust of Williams' expert opinion is that defendants should have negotiated a definite suspension term for plaintiff because then his controlled substance license would have automatically reverted to active status following the period of suspension. Williams opines that not only did defendants fail to achieve such a result for plaintiff, defendants did not even know a definite period of suspension was a possibility. According to Williams, defendants failed to work up the case to put it in a position where they could achieve reasonable settlement terms for

plaintiff. Moreover, Williams claims that, had defendants complied with the standard of care, they could have secured no worse than a 60-day suspension of plaintiff's controlled substance license. These statements are the principal basis for plaintiff's claim that he has produced the necessary evidence of proximate causation to withstand summary judgment.

¶ 34   Despite the expert opinion offered by plaintiff, plaintiff produced no evidence that the IDFPR would have under any circumstances agreed to a definite suspension period of plaintiff's controlled substance license. Williams' opinion is entirely speculative. The record reveals that IDFPR prosecutors have discretion in crafting and offering settlements and there are myriad factors that go into deciding what settlement terms should be. Williams cannot testify with any level of certainty what IDFPR prosecutors might be willing to offer or to accept in a given case. There is no evidence that the IDFPR would have ever agreed to a fixed period of suspension in this case. Without some concrete evidence that defendants could have done something differently to ensure a settlement offer with a definite period of suspension, even if we were to assume the preparation of the case by the attorneys was deficient, plaintiff has not produced evidence that defendants proximately caused the complained-of injury to plaintiff.

¶ 35   The uncontested evidence demonstrates that the IDFPR never offered plaintiff a definite term of suspension of his controlled substance license. Plaintiff had the opportunity to ask IDFPR prosecutor Lozovskiy in a deposition whether he would have agreed to discipline less stringent than what was included in the accepted settlement, but plaintiff did not ask the question. There is no evidence in the record that the IDFPR would have made better settlement terms available to plaintiff if his attorneys acted differently. The only "evidence" plaintiff relies upon that better settlement terms were attainable is the speculative assertion of his expert who could not conceivably know what the prosecutor would be willing to do in each individual case.

As Williams admitted in his deposition, he could not truly know whether the IDFPR would have agreed to any other terms in the settlement than those included in the settlement that was ultimately executed. There is no evidence in the record that the IDFPR would have ever offered or agreed to accept any other discipline for plaintiff, regardless of the steps defendants took on plaintiff's behalf. Williams' speculation about what the IDFPR might have been willing to do cannot serve as a stand-in for evidence of proximate cause. See *Kleiss v. Cassida*, 297 Ill. App. 3d 165, 174 (1998); *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967, 974 (1997). Speculation, conjecture, or guess is insufficient to withstand summary judgment. *Empress Casino Joliet Corporation v. Averus, Inc.*, 2020 IL App (1st) 192071, ¶ 37.

¶ 36    Moreover, the trial court was entitled to mostly disregard Williams' opinion insofar as it related to a separate client that Williams represented before the IDFPR around the same time period as plaintiff's disciplinary proceeding. See *Berke v. Manilow*, 2016 IL App (1st) 150397, ¶ 21 (when an expert's opinion relies on speculation, conjecture, or guess the court will not consider it as evidence to defeat a summary judgment motion). Affidavits offered in opposition to motions for summary judgment must consist of facts admissible in evidence and an expert's opinion is only as valid as the reasons for the opinion. *Id*. It is essentially irrelevant what specific terms the IDFPR was willing to agree upon with a different physician based on different conduct in a different case. Plaintiff does not establish that the doctor's discipline in the comparable case is the standard for how all IDFPR discipline is applied. Instead, as it is described in Williams' affidavit, he is describing what occurred "[i]n at least one case."

¶ 37    The orthopedic surgeon Williams represented was alleged to have improperly prescribed a Schedule III controlled substance, while plaintiff was alleged to have improperly prescribed a Schedule II controlled substance. Schedule II controlled substances have a greater degree of

potential for abuse and dependence (21 U.S.C. §812(b)(2-3) (West 2020)), and improperly prescribing a Schedule II substance is a more serious offense than improperly prescribing a Schedule III substance (see *e.g.*, *People v. Alcantara*, 179 Ill. App. 3d 105, 109 (1989); *United States v. Sullivan*, 967 F.2d 370, 372-73 (10th Cir. 1992)). The surgeon Williams described did not make an inculpatory statement to investigators before retaining counsel as plaintiff did here, admitting to a violation of the relevant statutes and admitting that he did not know the law. Plaintiff's admissions put him in a disadvantageous settlement position before defendants were even retained to represent him. The surgeon in the other case operates in an entirely different field of medicine than plaintiff, so their prescribing practices cannot be neatly analogized. They are charged with prescribing different drugs to address different issues and they stand in different relationships with their respective patients.

¶ 38     The overall terms of the two doctors' discipline contain many differences and demonstrate that no two cases are the same and that the IDFPR structures all settlements differently. The orthopedic surgeon that Williams represented in the other case received a suspension of his medical license, plaintiff did not. Plaintiff received only probation on his medical license, so plaintiff was allowed to continue practicing medicine for the duration of his disciplinary proceedings until he was restored to full privileges. The surgeon was required to pay a $10,000 fine, plaintiff did not have to pay a fine. The surgeon was required to complete 30 continuing education courses, plaintiff was required to complete three. The surgeon agreed to a permanent restriction on his ability to prescribe controlled substances to any patient for a period of longer than 12 weeks, no such restriction was placed on plaintiff and, in fact, plaintiff received no permanent restrictions whatsoever. Once plaintiff's controlled substance license suspension

was lifted, plaintiff was able to return to having full, unencumbered medical privileges. The surgeon accepted a permanent restriction on his practice.

¶ 39    There is a wide variance in the different elements of the two doctors' discipline. Of course, settlements from different cases cannot necessarily be compared to establish malpractice as each matter is fact-intensive and must be taken on its own facts. See *Justice v. Carter*, 972 F.2d 951, 956–57 (8th Cir. 1992) (cautioning against the use of putatively "comparable" cases as evidence in malpractice cases). Relying on a single comparison case in a situation as the one presented in this case is especially tenuous where the prosecutors have discretion to offer or refuse to offer certain terms as conditions for settlement. The allegations relating to plaintiff's prescribing practices to just A.S. take up five and a half pages (55 paragraphs) and contain unique, detailed descriptions of plaintiff's wrongdoing. The results Williams achieved for a client in a single, unrelated case are not demonstrative that defendants' actions or inaction were the cause of any adverse results for plaintiff. *Bergman v. Kelsey*, 375 Ill. App. 3d 612, 634 (2007) (the personal practices used by a testifying expert are not relevant and are insufficient to establish the applicable standard of care); *Stevenson v. Nauton*, 71 Ill. App. 3d 831, 835 (1979) (the expert's statements as to what he would have done in the situation encountered by the defendant are irrelevant since the issue before the trial court was whether the defendant acted contrary to accepted or customary standards at that time and place). The discipline imposed on a different doctor, from a different field of medicine, based on many different circumstances does not help to cure the speculative nature of Williams' opinions nor does it provide evidence of proximate cause in this case.

¶ 40    Plaintiff argues that proximate cause can be satisfied regardless of whether there is evidence that a settlement offer more favorable to plaintiff would have been accepted by the

IDFPR. In support of this argument, plaintiff relies heavily on our supreme court's opinion in *Smiley v. Manchester Insurance & Indemnity Co.*, 71 Ill. 2d 306 (1978). We find *Smiley* easily distinguishable. In *Smiley*, an insurance company was sued by its insured for unreasonably failing to settle a case for policy limits. *Id*. at 311. The insured had an automobile insurance policy with a policy limit of $20,000. *Id*. at 308. The insured was at fault in an accident where an individual was killed and another person was injured. *Id*. The family of the deceased and the injured party filed suit against the insured, but before trial the plaintiffs offered to settle the case for the policy limits. *Id*. Before the jury returned a verdict in the underlying case, the insurance company authorized the attorney to settle the case for the policy limits. *Id*. at 311. However, the attorney never conveyed the policy-limit offer to opposing counsel. *Id*.

¶ 41     The jury returned verdicts for the plaintiffs against the insured for amounts exceeding the policy limit, resulting in a personal judgment against the insured. *Id*. The insured then assigned his cause of action against the insurance company, for unreasonably failing to settle the case, to the injured parties. *Id*. The injured parties, as assignees, sued the insurance company for unreasonable failure to settle. *Id*. The insurance company then filed a third-party malpractice complaint against its former attorney, arguing that he was negligent for failing to communicate the policy-limits settlement offer to the plaintiffs before the jury returned a verdict, because the plaintiffs' settlement demand prior to the verdict was to settle for the policy limits. *Id*. at 311, 315.

¶ 42     In their malpractice case, the insurance company presented expert testimony to show what a reasonable attorney would have done under the circumstances. *Id*. at 312. The expert testified that a reasonable attorney would have taken some action on the authorization to settle and tried to resolve the case. *Id*. In holding in favor of the insurance company, the supreme court

explained that proximate cause was established even if the plaintiffs in the underlying case would not have accepted the settlement offer because the failure of the attorney to make an offer proximately caused damage to the insurance company. *Id.* at 314.

¶ 43    Plaintiff here contends that the situation in this case is analogous because, "what Lozovskiy would have done if defendants had acted differently is inconsequential to determination of whether plaintiff has met its burden of proximate cause at the summary judgment stage." We disagree. In *Smiley*, the issue of whether the settlement offer would have been accepted or not was inconsequential because the mere failure to offer a settlement proximately caused damage—the failure exposed the insurance company to liability to its insured for unreasonably failing to settle the case for the policy limits. *Id.* at 317. Thus, the requirement of proximate cause was satisfied with the evidence the attorney failed to make a settlement offer. *Id.*

¶ 44    In this case, we are dealing with a much more nebulous issue in which plaintiff has alleged that he would have received a better settlement offer if defendants acted differently while representing him. While in *Smiley* the issue of whether the settlement would have been accepted was inconsequential, in this case the question of whether Lozovskiy would have accepted a more favorable settlement if defendants acted as plaintiff argues they should have acted, is not "inconsequential"—it is the crux of his case. It is plaintiff's contention that Lozovskiy would have made or accepted a far better offer if defendants acted as reasonable, competent attorneys under the circumstances. Plaintiff does not supply any evidence to support that contention and, therefore, he cannot prove his malpractice claim. Because plaintiff failed to submit evidence on an essential element of his claim, the trial court properly granted summary judgment in defendants' favor.

¶ 45                                CONCLUSION

¶ 46     Based on the foregoing, we affirm.

¶ 47     Affirmed.